# EXHIBIT 1

STATE OF MINNESOTA                              DISTRICT COURT

COUNTY OF HENNEPIN                        FOURTH JUDICIAL DISTRICT

---

Brock Wolff,                                    Court File No. _____

        Plaintiff,

v.                                              **SUMMONS**

Nexus,

        Defendant.

---

THIS SUMMONS IS DIRECTED TO DEFENDANT NEXUS:

1. **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

2. **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons a **written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

   BAILLON THOME JOZWIAK & WANTA LLP
   100 South Fifth Street, Suite 1200
   Minneapolis, MN 55402

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get

legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: November 2, 2018

Christopher D. Jozwiak
Bar No. 0386797
Jerri C. Adams
Bar No. 0396352
*Attorneys for Plaintiff*
BAILLON THOME JOZWIAK & WANTA LLP
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Fax: (612) 252-3571
cdjozwiak@baillonthome.com
jadams@baillonthome.com

2

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

---

Brock Wolff,

                Plaintiff,

v.

Nexus,

                Defendant.

Court File No. _____

**COMPLAINT AND
JURY DEMAND**

---

      The Plaintiff, Brock Wolff, for his Complaint against Defendant, Nexus, states and alleges as follows:

<u>**PARTIES, JURISDICTION & VENUE**</u>

    1.     Plaintiff is a natural person, who at all times relevant, resided in the City of Plymouth, County of Hennepin, State of Minnesota.

    2.     Defendant is a domestic nonprofit corporation licensed to conduct business in the City of Plymouth, County of Hennepin, State of Minnesota.

    3.     At all times relevant, Plaintiff and Defendant were "employee" and "employer," respectively, within the meaning of Minn. Stat. 363A.01 *et. Seq.*

    4.     This Court has jurisdiction over this action because it falls within the Court's general subject matter jurisdiction.

    5.     Venue is proper in Hennepin County because the acts and omissions complained of herein occurred in Hennepin County and Defendant conducts business in Hennepin County.

<u>**FACTS**</u>

    6.     Plaintiff is a high-performing executive with over 25 years of experience within the non-profit industry.

1

7.      Plaintiff began working for Defendant in October 2012 as its Chief Operating Officer.

8.      Plaintiff was told at the time of hire that it was Defendant's intent for him to become the Chief Executive Officer ("CEO") in 3-5 years when Defendant's then-CEO David Hutchinson ("Hutchinson") retired.

9.      Plaintiff worked tirelessly to improve the general business operations of all of Defendant's business units and affiliates.

10.     During his employment with Defendant, Plaintiff received outstanding performance reviews from Hutchinson.

11.     At this time, Plaintiff was well-respected by his direct reports, his peers, the Board and key partners.

12.     In November 2016, Defendant quietly announced that Hutchinson would retire by the end of March 2017 and Plaintiff would gradually transition into the CEO role.

13.     However, by December 2016, Hutchinson moved full-time to Missouri and abandoned his job duties as CEO.

14.     As a result of Hutchinson's abrupt absence, Plaintiff assumed Hutchinson's CEO duties but was not given the authority or access of a true CEO until March 2017.

15.     After taking over the CEO role, the true state of Defendant's finances and operations was revealed to Plaintiff.

16.     Specifically, Plaintiff learned about the inappropriate relationship Hutchinson developed between himself and the Board of Directors (the "Board").

17.     Plaintiff observed that Hutchinson and the Board treated their relationship more like a social club than an oversight body responsible for managing over $110 million worth of services in several states.

18.     The Board appreciated Hutchinson's deferential demeanor and "hands-off" approach.

19.     At base, Hutchinson allowed the Board's members to enjoy the credential of serving on a non-profit board without causing too much "trouble." This arrangement proved to be mutually beneficial to Hutchinson and the Board.

20.     While CEO, Hutchinson reaped financial benefits as a result of his positive relationship with the Board, such as a reassessment of goals each year which afforded Hutchinson the "top score" and a bonus of approximately $80,000 each year.

21.     Additionally, Hutchinson never had personal time off approved by the Board and thus nothing was ever deducted from the time that was officially allotted to him. Hutchinson's time off was "on an honor system" with the Board. Because of this practice, Hutchinson received a payout upon his retirement that was in excess of what he earned.

22.     Hutchinson also received several raises during his tenure which were not based on performance. This is evident by the fact that a performance appraisal was never done for him.

23.     Hutchinson and the Board seemingly intended for this financially beneficial relationship to continue after Hutchinson's tenure as CEO ended.

24.     Prior to leaving the organization, Hutchinson pressured Plaintiff into retaining him as a consultant following his separation from Defendant.

3

25.     Plaintiff felt extremely uncomfortable agreeing to such an arrangement considering that Hutchinson had previously requested a generous severance package which Plaintiff was instructed to draft.

26.     Reed Robinson ("Robinson"), President of the Board and close friend of Hutchinson, held unprecedented influence over Defendant's daily operations.

27.     For over eight years, Robinson was personally involved in decisions related to Hutchinson's salary, performance reviews, bonuses and general leadership.

28.     Robinson also pressured Plaintiff to consider retaining Hutchinson as a consultant following his departure.

29.     Robinson told Plaintiff to consider how "valuable" Hutchinson would be during the transition phase.

30.     In the end, Plaintiff did not hire Hutchinson as a consultant.

31.     In early October 2016, Plaintiff discovered that Defendant has been paying for Hutchinson's Twin Cities' apartment—even after Hutchinson had moved his family to Missouri.

32.     In or around November 2016, Plaintiff made a good faith report about Defendant's payment of Hutchinson's apartment to Robinson. Plaintiff told Robinson that such a payment arrangement may violate IRS rules and the organization's fiduciary duties.

33.     Robinson said he did not believe that Hutchinson would agree to such an arrangement, due to his "high integrity," but told Plaintiff he would investigate the matter.

34.     In October 2016, Mark Nufer ("Nufer"), Defendant's then-Chief Financial Officer ("CFO"), resigned due to his own concerns about the lack of fiduciary responsibility within the organization—including but not limited to Hutchinson's apartment and proposed consulting contract.

4

35.     Nufer outlined his concerns about Defendant's conduct in his resignation letter and stated that what was occurring would amount to tax fraud and be a red flag during the auditing process.

36.     When Nufer's resignation brought these legal and ethical concerns to the Board's attention, a senior leadership meeting was held to discredit Nufer and his reports and assure others that Hutchinson had no knowledge of any wrong-doing.

37.     On April 1, 2017, Plaintiff officially became Defendant's CEO.

38.     The Board offered Plaintiff a salary of $300,000, which is $40,000 below market standards and nearly $70,000 below Hutchinson's former salary.

39.     Nevertheless, Plaintiff accepted the position because he was enthusiastic about the organization and wanted to do what he could to improve its services.

40.     Plaintiff's chief priority was to demonstrate to the Board his intent to operate the organization with integrity and transparency and to address the problems Hutchinson had long neglected.

41.     Almost immediately, the Board resisted Plaintiff's efforts to overhaul the organization.

42.     The Board severely criticized Plaintiff's leadership abilities and complained about the length of his meetings, his presentation style, his personality, hiring decisions, and his decision to eliminate Hutchinson's former practice of giving Board members expensive gifts among other things.

43.     Additionally, Plaintiff sought to enact term limits for all Board members and told them they would be expected to contribute to the organization with donations.

44.     According to Defendant's accrediting body, Charity Navigator, and non-profit industry standards, Board members' terms must be limited.

45.     Plaintiff hoped that by implementing term limits, he could eliminate conflicts of interest that existed during Hutchinson's tenure, facilitate innovation and prevent Board members from abusing their positions.

46.     Plaintiff recommended that Board members be limited to serving two (2) terms that are each three (3) years in length.

47.     The Board harshly opposed Plaintiff's proposed term limits as several members of the Board were serving their fourth and fifth terms.

48.     In the end, the Board "grandfathered" Laurie Zenner, Peter Freeman and Laureen Carlson, even though they exceeded the two-term limit rule and gave itself the option to allow for third term extensions.

49.     Plaintiff also sought to overhaul Defendant's existing financial protocols.

50.     In January 2016, Hilke Reichart-Martinez ("Martinez") was hired to replace Nefur as CFO.

51.     Immediately, Martinez discovered alarming information regarding Defendant's financial state in four key areas:

| Nexus Diversified Community Services ("NCDS") | NDCS is a separate entity that the Board is also responsible for overseeing. NDCS is where Defendant holds $30 million in investments. Hutchinson used NDCS to artificially inflate annual profits by taking funds without the Board's approval. |
| --- | --- |
| Liability Insurance | Hutchinson obtained liability insurance for Defendant without prior Board approval. For several years, he failed to pay the insurance company. Defendant accrued a $5 million bill. Hutchinson and a former CFO negotiated a settlement with the insurance company to retain coverage for an additional three years with the company having the option to increase the |

| | monthly premium. The Board was never notified of these negotiations or the finalized settlement. |
|---|---|
| Veba Trust | The trust is used to self-insure Defendant's affiliate sites. At one point, the trust held $5 million in assets. During an average month, Defendant would receive approximately $900,000 worth of claims. The affiliates were required to pay 90% of the claim in coinsurance. However, Hutchinson reduced the amount of coinsurance the affiliate sites were required to pay to artificially reduce the amount of their expenses and to improve the appearance of Defendant's overall profitability. |
| Accounts Receivable at Woodbourne | Woodbourne is an affiliated treatment site located in Baltimore, Maryland. Woodbourne needed to write off $1.2 million in accounts receivables. However, Defendant's finance department only agreed to write off $600,000. The auditors approved this underreporting, but in late April 2016, Plaintiff sought to write off an additional $700,000. However, Woodbourne's performance was negatively impacted by this additional write-off. The Board blamed Plaintiff for the decision to write off the remaining accounts receivable. |

52.     Plaintiff also uncovered that Hutchinson had failed to address Defendant's debts to the State of Illinois and the Woodbourne site.

53.     On or around August 2017, Plaintiff reported the debts to the Board during the annual Board meeting but was met with resistance when he informed it that he intended to pay back the outstanding debts.

54.     Additionally, around this time, Plaintiff recategorized several Unit Coordinator workers and other staff who had been misclassified as non-exempt employees for years.

55.     In February 2017, Plaintiff and Martinez presented their discoveries to the Board.

56.     Afterwards, Plaintiff and Martinez retained outside forensic accountants to audit Defendant's financial records.

57.     The audit confirmed Plaintiff and Martinez's concerns.

58.     Plaintiff immediately sought to address these issues and took proactive steps to ensure that Defendant met its legal and fiduciary responsibilities.

59.     However, the Board strongly resisted Plaintiff's efforts to implement new financial controls and pay back the organization's debts.

60.     By June 2017, Plaintiff began to feel the strain of his position.

61.     Plaintiff went to the hospital where it was discovered that only 20% of his heart was fully functioning.

62.     Board members, most notably Robinson, continually referred to Plaintiff's condition as a heart attack, even though Plaintiff had never had a heart attack and no matter how many times Plaintiff corrected them.

63.     On June 2, 2017, Plaintiff submitted a request for leave under the Family Medical Leave Act ("FMLA") to have heart surgery.

64.     Specifically, Plaintiff requested intermittent leave where:

- Plaintiff was not supposed to work at all for the first two weeks.
- At three (3) weeks, he would work from home for four (4) hours per day;
- At six (6) weeks, he would work from home for five (5) hours per day;
- At twelve (12) weeks, he would return to work full-time without restrictions.

65.     On June 5, 2017, Plaintiff underwent double by-pass surgery.

66.     Pursuant to his FMLA leave request, Plaintiff was scheduled to return to work full-time on August 28, 2017.

67.     However, the Board clearly communicated its expectation that Plaintiff continue to meet the demands of the job even while he was recovering.

8

68.     Due to the Board's demands, Plaintiff had no time to recover from his surgery.

69.     Instead, Plaintiff immediately began working a full-time schedule which averaged about 50 hours per week.

70.     Throughout the months of July and August, Plaintiff worked tirelessly to oversee board meetings across the country. Plaintiff was expected to organize and plan the annual Board meeting on August 8th, as well as attend the Woodbourne Board meeting in Baltimore and the PATH Board Meeting in Fargo.

71.     Although Plaintiff did his best to keep up with the Board's demands, the Board used his health issues as an excuse to question his performance.

72.     Specifically, Robinson and the Board openly questioned Plaintiff about whether he was being truthful about the extent of his health issues.

73.     At the end of a meeting in July, Robinson stated that he wanted all senior leadership to participate in an executive health program with Mayo Clinic. He also said that he felt that the Board should receive all medical information about each senior leader, since Defendant would be paying for it.

74.     Robinson implied that Plaintiff needed the health consultation due to his heart surgery, and that the Chief Clinical Officer needed the consultation due to her weight, eating habits and stress levels.

75.     Robinson insisted that all senior leadership members, including Plaintiff, receive executive leadership coaching from a consultant he would personally source.

76.     On August 8, 2017, at the annual Board meeting, Plaintiff presented his strategic vision to the Board.

77.     Following the meeting, Plaintiff's staff members remarked that Natalie McGrady ("McGrady") and Tom Emig ("Emig") were openly hostile towards Plaintiff and his "change agent" leadership style.

78.     Around this time, Plaintiff discovered that Defendant had been illegally disclosing patients' confidential health records in violation of state privacy laws.

79.     This illegal disclosure practice had been taking place for years prior to Plaintiff's discovery and had far-reaching impact on patients' criminal and custody matters.

80.     Plaintiff immediately made a good faith report about the illegal conduct to Defendant's attorney, Mark Manderfeld, ("Manderfeld").

81.     Plaintiff stated that this practice likely violated health record privacy laws.

82.     It is unclear if Defendant took any actions to address Plaintiff's report.

83.     In September 2017, Defendant held its annual conference.

84.     During the conference, Robinson spent several unaccompanied hours with Plaintiff's direct reports and actively campaigned to pressure Plaintiff into participating in an executive health program.

85.     When Plaintiff confronted Robinson about his conduct, he told Robinson that he felt constrained by the Board.

86.     Despite the Board's treatment, Plaintiff continued to do his best to perform his job well.

87.     One of Plaintiff's greatest concerns was that Defendant's corporate structure did not sufficiently protect its leaders from personal liability.

88.     On October 5, 2017, Plaintiff sent an email to the Board inviting them to attend a voluntary presentation where Manderfeld would explain the organization's then-current structure.

89.     Only three Board members attended, as well as several corporate leadership and staff members.

90.     Robinson loudly announced that he had not been informed that staff were invited to attend the presentation and questioned the purpose of the meeting.

91.     Plaintiff jokingly told Robinson that by streamlining Defendant's organizational structure it would reduce how much he traveled.

92.     Robinson and Emig reacted angrily in front of the group.

93.     Emig aggressively asked Plaintiff, "You applied for the job, didn't you?"

94.     On October 10, 2017, the Board held its monthly meeting.

95.     Robinson immediately announced that he would again "embarrass" Plaintiff that day.

96.     Robinson openly belittled Plaintiff and questioned his leadership ability on a proposed construction project scheduled to take place at one of Defendant's facilities.

97.     Manderfeld approached Plaintiff after the board meeting and said, "Brock, that was the most contentious Board meeting I have attended in my 30 years at Nexus." This was said in the presence of other Board members who agreed.

98.     Plaintiff's staff members, who attended the meeting, were horrified by Robinson's conduct.

99.     The Board ultimately decided to delay approval of the construction project "until more details were obtained." Many requests for information were made that Plaintiff recognized as unusual for a construction project at that level. After Plaintiff left the company, the project was approved without any further questions.

100.    On October 10th, Plaintiff made a good faith report to McGrady that the organization had been fraudulently billing its clients by underreporting revenue and misrepresenting its financial status in different counties to get substantial rate increases.

101.    Specifically, Defendant had been overcharging Minnesota counties for years in order to inflate its own revenue metrics.

102.    Defendant failed to accurately disclose its annual revenue; as a result, counties were misled about the services their payments covered.

103.    Plaintiff reported the fraudulent billing practice to Vice Chair of the Board, Paul Zimmer, and Board member Peter Freeman.

104.    To address this fraudulent conduct, Plaintiff suggested that Defendant contact these counties and provide accurate revenue metrics.

105.    Upon information and belief, Defendant took no action to address Plaintiff's report.

106.    On October 17, 2017, Plaintiff attended a strategic planning meeting in Baltimore where Christina Church ("Church"), a staff member at Woodbourne, stood at the front of the assembled group writing on a flip chart.

107.    The meeting was held in a very hot and humid room.

108.    Church proceeded to remove her jacket and shoes despite the professional setting.

109.    In an effort to make light of Church's awkward behavior, Plaintiff stated, "Please do not take off your shirt next. Can we get you a chair?"

110.    Plaintiff immediately realized that he had surprised Church with his comments.

111.    Later that evening, Plaintiff personally apologized to Church.

112.    Church responded that it was "cool" of Plaintiff to apologize and accepted his apology.

113.     On October 23, 2017, Plaintiff's direct reports notified him that several people had complained about his comments toward Church and other senior leaders.

114.     Up until these complaints, Plaintiff had never been disciplined or coached about his off-hand comments or jokes.

115.     Nevertheless, the Board reacted swiftly by confiscating Plaintiff's work phone and computer.

116.     The Board initiated an investigation into the complaints about Plaintiff's conduct.

117.     The Board did not ask Plaintiff to provide any evidence or testimony to refute the allegations.

118.     The stress of the investigation began to weigh on Plaintiff and he again experienced chest pains and anxiety.

119.     Plaintiff was admitted to the hospital and a stent was placed in his artery.

120.     Plaintiff requested FMLA leave to recover.

121.     Pursuant to his FMLA request, Plaintiff's leave was scheduled to take place from October 18th, 2017 to November 6th, 2017.

122.     Although Plaintiff was recovering from surgery, Plaintiff fully cooperated with the investigation.

123.     On November 13, 2017, Plaintiff met with Jennifer McIntosh ("McIntosh"), Vice President of Human Resources, and McGrady.

124.     For over an hour, Plaintiff answered McIntosh and McGrady's questions—even the questions which were unrelated to the allegations against him.

125.     On December 8, 2017, Plaintiff met with McGrady and Paul Zimmer and was given a termination and separation agreement offering a 4 months' severance totaling $109,038.51, a

gross payout of his PTO totaling $20,835.45, and partial payment of COBRA premiums in exchange for his release of all claims against Defendant.

126.    The Board offered no reason to justify Plaintiff's termination.

127.    Plaintiff did not accept the severance agreement.

**COUNT I**
**Interference with Family Medical Leave Act**

Plaintiff re-alleges all preceding paragraphs of this Complaint.

128.    The FMLA, 29 U.S.C. § 2916(a), provides that is unlawful for an employer to "interfere with, restrain, or deny the exercise of or attempt to exercise" any rights provided under the FMLA.

129.    29 C.F.R. § 825.220(a) of the FMLA's implementing regulations states that "the FMLA prohibits interference with an employee's rights under" the FMLA.

130.    29 C.F.R. § 825.220(b) describes the scope of what constitutes interference with the rights under the FMLA as "interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."

131.    29 C.F.R. § 825.220(c) states that FMLA also prohibits an employer from discriminating against an employee for having exercised FMLA rights.

132.    Defendant interfered with Plaintiff's exercise of his rights under the FMLA. This interference includes, but is not limited to, disciplining him for minor infractions within days of returning from leave and terminating his employment two days after he exercised his rights under the FMLA.

133.    As a result of Defendant's conduct in direct violation of the FMLA, Plaintiff suffered a loss of income and other damages in an amount to be proven at trial

## COUNT II
### Retaliation in Violation of the Family Medical Leave Act

Plaintiff re-alleges all preceding paragraphs of this Complaint.

134.    Defendants, by and through their managers and officials acting on their behalf, and within the scope of their employment, retaliated against Plaintiff in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2911 *et seq*. These practices include, but are not limited to, retaliating against Plaintiff for taking FMLA leave, 29 U.S.C. § 2615(a)(2).

135.    The unlawful employment practices complained of above were intentional and were performed by Defendants with malice and/or reckless indifference to the anti-retaliation laws that protected Plaintiff.

136.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer emotion distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits and other serious damages.

## COUNT III
### Disability Discrimination in Violation of the Minnesota Human Rights Act

Plaintiff re-alleges all preceding paragraphs of this Complaint.

137.    Defendant, through its managers and officials acting on their behalf, and within the scope of their employment, engaged in unlawful employment practices in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq*. These practices include, but are not limited to, terminating Plaintiff and altering the terms and conditions of his employment because of Plaintiff's disability, record of disability or perceived disability.

138.    Defendant failed to take all reasonable steps to prevent discrimination based on Plaintiff's disability, record of disability or perceived disability from occurring.

139.    The effect of the practices complained of above have been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his disability, record of disability or perceived disability.

140.    The unlawful employment practices complained of above were intentional and were performed by Defendant with malice or reckless indifference to anti-discrimination laws to protect Plaintiff.

141.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered and continues to suffer emotion distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits and other serious damages.

## COUNT IV
### Retaliation in Violation of the Minnesota Whistleblower Act

Plaintiff re-alleges all preceding paragraphs of this Complaint.

142.    Plaintiff, in good faith, reported what he believed to be violations of state and federal laws, rules adopted pursuant to law and/or common law relating to Defendant's operation.

143.    Plaintiff reasonably believed, in good faith, that Defendant violated laws, regulations adopted pursuant to law and common law, including but not limited to: Health Insurance Portability and Accountability Act ("Hippa"), 42 U.S.C. § 1320d-6, common law fraud, breach of contract, and statutory fiduciary duties.

144.    Plaintiff's reports were a motivating factor in adverse employment actions, including but not limited to termination of his employment.

145.    The adverse actions alleged in this Complaint constitute violations of Minnesota Statutes § 181.932.

146.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer emotion distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits and other damages.

## PRAYER FOR RELIEF

Therefore, Plaintiff requests that judgment be entered against Defendant for the following:

a.    Declaring that Defendant's acts or omissions described in this Complaint constitute violations of applicable federal and state laws which protect Plaintiff;

b.    Enjoining Defendant and its employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries and all other persons acting in concert or participation with it, from its unlawful acts;

c.    Requiring Defendant to make Plaintiff whole for its adverse, retaliatory, and discriminatory actions with compensatory damages and with interest of an appropriate inflation factor;

d.    Treble damages under the Minnesota Human Right Act;

e.    Awarding Plaintiff attorneys' fees, costs, and disbursements pursuant to statute; and

f.    Granting other and further relief as the Court deems fair and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS WHERE TRIAL BY JURY IS AVAILABLE.**

Dated: November 2, 2018

Christopher D. Jozwiak
Bar No. 0386797
Jerri C. Adams
Bar No. 0396352
*Attorneys for Plaintiff*
BAILLON THOME JOZWIAK & WANTA LLP
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Fax: (612) 252-3571
cdjozwiak@baillonthome.com
jadams@baillonthome.com

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney's fees may be awarded pursuant to Minn. Stat. § 549.211 to the party against whom the allegations in this pleading are asserted.

Dated: November 2, 2018

Jerri C. Adams